STATE

v.

Raymond A. MERCIER.

No. 79–441–C.A.

Supreme Court of Rhode Island.

June 5, 1980.

Dennis J. Roberts II, Atty. Gen., Faith A. LaSalle, Sp. Asst. Atty. Gen., for plaintiff.

Alton W. Wiley, Providence, for defendant.

OPINION

KELLEHER, Justice.

The Administrative Adjudication Division (the division) of the Department of Trans-

portation occupies a portion of a building in Providence which also houses the Sixth District Court. On May 24, 1978, when Raymond A. Mercier (Mercier) came to the division to answer a complaint charging him with a violation of the Motor Vehicle Code, chances are he never had in mind what actually happened on that day. Suffice it to say that before the morning was over, Mercier had been arrested and charged with assaulting a Providence police officer, Ambrose Federico (Federico), with a dangerous weapon, to wit, a 1978 Chevrolet Monte Carlo. This charge was later embodied in a criminal information that the Attorney General filed in the Superior Court in July of 1978.

A Superior Court jury heard evidence indicating that the division requires an alleged violator to surrender his driver's license prior to appearing before a hearing officer. If the penalty imposed is a fine, once payment is made, the motorist is entitled to the return of his license. After Mercier's case was heard, he appeared in the clerk's office for the ostensible purpose of paying the fine. Instead, Mercier spied his license lying in an open drawer and, for reasons known only to him, snatched it and headed for the stairway leading to the first floor and the adjoining parking lot. Within seconds, the chase was on as someone alerted one and all that a culprit had regained his license without the formality of paying his fine.

Mercier made it to the Monte Carlo. (The car was registered to an automobile dealer.) He locked the doors, and, as he did, the car was engulfed by his pursuers. Several of them were police officers who had been attending various proceedings at the District Court but who had responded to the shouts of the division's personnel. One of the responders was Federico. He headed for Mercier and the Monte Carlo with several other officers. Mercier first attempted to back out along a driveway that led to nearby Harris Avenue. This escape route was suddenly shut off as a taxicab turned into the driveway, thus effectively barring Mercier's departure. Mercier shifted gears, and as he began to move

forward, he struck Federico's right leg. The pursuit came to an end as Federico and his partner drew their weapons and Mercier, obviously believing discretion to be the better part of valor, surrendered.

Seven months later, a Superior Court jury found Mercier guilty of simple assault. The trial justice imposed a thirty-day jail sentence and a $250 fine.

On appeal, Mercier contends that the trial justice erred in charging the jury and prejudiced his right to a fair trial by making certain remarks as she ruled on a variety of issues.

In her charge, the trial justice informed the jurors that if they were not convinced that Mercier was guilty of the offense charged in the information, they could find him guilty of the lesser but included offense of simple assault. Mercier objected to this portion of the charge and, in an all-or-nothing tack, claims that if there was no assault with a dangerous weapon, an acquittal was in order. In his request to charge, Mercier claimed that the all-or-nothing charge was in order because (1) the evidence adduced afforded an evidentiary basis solely for the dangerous-weapon count, (2) no one had requested the simple assault charge, and (3) a charge on the lesser included offense would invite a compromise verdict.

When addressing the question of what constituted a dangerous weapon, the trial justice pointed out that there are some items that in and of themselves constitute dangerous weapons, such as knives or loaded guns, while there are other articles that are not per se dangerous but may become dangerous in the manner in which they are used. The trial justice then explained to the jurors that there was a big difference between a baseball bat lying inert on the dugout steps and the same bat in the hands of one who "swing[s] it across someone's skull." After giving this example, the trial justice told the jury: "You have to decide from the manner of its use or attempted use whether the so-called dangerous weapon here, from the manner of its use, was likely to produce or cause bodily injury."

■ This charge reminds us that there may be a conviction of assault with a dangerous weapon when the object used in the assault is not per se a dangerous weapon if it appears that the object was used in such a way that it had the capability of producing serious bodily harm. The test is not whether serious bodily harm results, rather it is whether the object was so used that serious bodily harm may have resulted. The object's latent capability alone is not determinative; what is determinative is such capability coupled with the manner of use. *United States v. Johnson*, 324 F.2d 264, 266 (4th Cir. 1963); *Berfield v. State*, 458 P.2d 1008 (Alaska 1969); *State v. Anderson*, 242 Or. 585, 411 P.2d 259 (1966).

■ These principles have been applied uniformly when the instrumentality in question was an automobile. An automobile in and of itself is not considered a dangerous weapon, but it may become so if it is employed in such a manner to render it capable of inflicting death or serious bodily injury. *United States v. Williamson*, 482 F.2d 508 (5th Cir. 1973); *Williamson v. State*, 92 Fla. 980, 111 So. 124 (1926); *People v. Goolsby*, 284 Mich. 375, 279 N.W. 867 (1938); *People v. France*, 57 App.Div.2d 432, 394 N.Y.S.2d 891 (1977); *State v. Orlett*, 44 Ohio Misc. 7, 73 Ohio Ops.2d 30, 335 N.E.2d 894 (1975); *Beck v. State*, 73 Okl.Cr 229, 119 P.2d 865 (1941); Annot., 89 A.L. R.3d 1026 (1979).

■ The trial justice, in charging on the lesser but included crime of simple assault, relied on G.L. 1956 (1969 Reenactment) § 12–17–14 (1979 Supp.), which provides that whenever the factfinder considering evidence against a person named in an indictment, information, or complaint "shall not be satisfied" that the accused "is guilty of the whole offense, but shall be satisfied that he is guilty of so much thereof as shall substantially amount to an offense of a lower nature," the factfinder may return a finding of "guilty of such lower offense." Here, there was evidence suggesting that the assault was nothing more than a "nudge." Federico conceded that his contact with the Monte Carlo left no bruises and he neither was hospitalized nor lost any time from work. Although he said at one time that the collision pushed him back, Federico made it clear that the push back may have been caused by his own retreat as the car began to proceed forward. Other evidence of what occurred is to be found in the report filed by a Cranston police officer who was part of the chase team. This report, which is in evidence, described the assault thus: "It was a tap with the bumper he didn't drive into him hard, he just creeped forward and went into him."

General Laws 1956 (1969 Reenactment) § 8–2–38 permits a trial justice to give instructions regarding those rules of law that of necessity must be raised at the trial in order to ensure the defendant a fair trial. *State v. Butler*, 107 R.I. 489, 268 A.2d 433 (1970). Here, the police report, in depicting the creeping Monte Carlo, raised an issue about whether or not Mercier's method of driving had converted the Monte Carlo into a dangerous weapon. In the light of the evidence, the trial justice quite properly charged the jury on the issue of simple assault.

■ Federico was subjected to vigorous and lengthy questioning by defense counsel during cross- and re-cross-examination. At one point in cross-examination Federico told the jury that at the time of Mercier's hurried exit from the building, Federico was in the District Court's clerk's office. When Federico was asked if "there are girls working in that office typing, et cetera," the prosecutor objected. When the trial justice asked if his objection was directed to defense counsel's "use of the word 'girls' instead of 'women,'" the response was, "No, although I do object to that." The trial justice answered: "I would certainly sustain on those grounds, but I do question relevancy, Mr. Wiley."

Later, in cross-examination, Federico was asked a series of questions about whether or not anyone had told Mercier why he was arrested or if Federico had advised Mercier "of anything at that particular time." At this juncture the trial justice called counsel to the bench for a side-bar conference.

When defense counsel was asked if his client had ever given a statement to the police, the response was, "I don't know." The prosecution, however, assured the trial justice that there was no statement. The trial justice told defense counsel that if the prosecutor had asked a question that was designed to show that the defendant said nothing when accused of the crime, "I would tell the prosecutor that is unfair comment on privileged information. Don't play around with this issue, Mr. Wiley."

Just as the redirect examination concluded, Federico gave an affirmative reply when he was asked: "* * * is it fair to say that he [Mercier] was aware of your presence in front of the automobile at that time [just before the Monte Carlo went forward]?" Immediately upon re-cross-examination objections were entered when Federico was asked by defense counsel if he was "clairvoyant" or "a mind reader." Federico then answered a couple of questions with "Yes, sir." At this point Federico was asked why he was "yes-sirring" counsel and if he thought "[the] whole case is a joke." After Federico responded that he considered the trial to be a serious matter, an objection was made and the following colloquy ensued:

"The Court: Mr. Wiley, are you prepared to ask that your comments be stricken from the record?

Mr. Wiley: Am I what, please?

The Court: Are you prepared to strike your improper comments from the record?

Mr. Wiley: Yes, your Honor.

The Court: Would you ask the Court's indulgence?

Mr. Wiley: I would ask the Court's indulgence to strike my improper comments concerning the witness' smiling from the record. I would ask the Court's indulgence. I would ask it be stricken.

The Court: It will be stricken from the record. I'm not altogether sure how indulgent I intend to be with you from here on in."

Mercier takes the position that the trial justice's women's liberation comments, her admonition to counsel about "playing around" with the issue, and the necessity of begging the court's indulgence so prejudiced his cause that a new trial is a necessity. While we cannot be 100 percent sure from the cold record, we have every reason to believe that the trial justice's comments regarding counsel's choice of words to describe the female of the species was a facetious observation designed to bring a touch of humor to the proceedings. Perhaps counsel in his preoccupation with the pressures of the trial failed to appreciate the humor of the situation, but the trial justice was right on target when she questioned the relevancy of inquiring about who was in the clerk's office.

The trial justice's comment about any potential prosecutorial misconduct might have been inaccurate, but the fact is that her admonition to stop playing around "with this issue" was made at the side bar and completely out of the hearing of the jury. Here, again, the inquiries were being made when it was evident from the record that at no time did Mercier make a statement once the chase was over and he was handcuffed.

■ The so-called "indulgence" remarks might have been a source of some embarrassment to defense counsel. However, not every admonition made by the trial justice in the presence of the jury to indicate displeasure with counsel is grounds for reversal. *Pescatore v. MacIntosh*, 113 R.I. 139, 319 A.2d 21 (1974). The trial justice has the undoubted right to correct counsel's conduct in the courtroom whenever circumstances appear to dictate that such correction is necessary to prevent indecorum from degenerating into disorder. *State v. Harrington*, 93 R.I. 36, 171 A.2d 72 (1961). Here, a mild rebuke was in order, for the re-cross-examination had reached the state of argumentation rather than interrogation. Matters were at a stalemate, and the trial justice obviously was interested in getting on with the trial. On this record we are not prepared to say that her remarks created such an atmosphere that it became almost impossible for the jury to consider the evi-

dence fairly and impartially. *State v. Kieon*, 93 R.I. 290, 175 A.2d 284 (1961). On the contrary, we are convinced that Mercier had a full opportunity to present his defense to the charge brought against him.

The issue presented to the jury was quite simple. It was undisputed that Mercier operated the Monte Carlo in an attempt to take unannounced leave of the District Court parking lot. The jury found that there was contact between the Monte Carlo's bumper and Federico's knee but refused to find that Mercier had operated the automobile in such a fashion that would justify a finding that the Monte Carlo had been converted into a dangerous weapon. Consequently, we must reject Mercier's claim of prejudice.

The defendant's appeal is denied and dismissed, and the judgment of conviction is affirmed.