STATE

v.

Andrew JEREMIAH.

No. 87–287–C.A.

Supreme Court of Rhode Island.

Aug. 18, 1988.

James E. O'Neil, Atty. Gen., Thomas Dickinson, Asst. Atty. Gen., Caroline Cole Cornwell, Asst. Atty. Gen., for plaintiff.

John A. O'Neill, Jr., Providence, for defendant.

## OPINION

WEISBERGER, Justice.

This case is before us on the defendant's appeal from judgments of conviction on one count of assault with a dangerous weapon and two counts of breaking and entering in the daytime entered in the Superior Court following a jury trial. We affirm. The facts insofar as pertinent to this appeal are as follows.

In June of 1984, the defendant, Andrew Jeremiah (Jeremiah) and his brother purchased a multiple-unit manufacturing complex located on Charles Street in Providence. In accordance with the purchase agreement, the Jeremiahs were to assume any and all leases and tenancies in effect as of the date of purchase. Among those leases to be assumed by the Jeremiahs was the lease agreement for Gennaro, Inc. (Gennaro), a jewelry-manufacturing business owned by Steven and Beverly Casinelli.

Several weeks after Jeremiah bought the complex, a dispute arose between Jeremiah and the Casinellis regarding the fee for water usage, the amount of space being occupied by Gennaro, and the amount of rent being paid by the Casinellis for the space. According to the lease agreement entered into between the Casinellis and the former owners of the complex (in September 1983, to be effective for two years), the Casinellis would occupy 3,500 square feet on the second floor of one of the buildings known as "Building no. 15." However, the Casinellis were informed by Jeremiah that they were actually occupying approximately 6,000 square feet, and that he intended to raise their rent from $375 per month to about $1,200 per month. The Casinellis refused to pay the additional rent.

The lease agreement also provided that the Casinellis would pay a water-usage fee for any water used in the course of their business. It seems that the bulk of the water bill was attributed to two water-cooled air-conditioning units being used by the Casinellis for Gennaro. One of the units was located in Building no. 15, whereas a second unit was located in Building no. 24, in an area of the building occupied by Gennaro, but not covered in the lease. Although they had not been previously paying for water, in spite of the terms of the lease, the Casinellis agreed to do so in the future, as long as Jeremiah either installed a meter to measure the amount of water being used, or presented them with a bill for water they had used.

According to Jeremiah, the Casinellis elected not to pay to use the air conditioners. Consequently, Jeremiah "shut down" the units by installing locks on the master switches so that the units could not be operated. Several days later, Jeremiah noticed that the air conditioners were being used in spite of the locks that had been installed. Beverly Casinelli explained on cross-examination that because it was midsummer and the windows in their offices could not be opened, she and her husband had cut the locks on the air conditioners so that the two units could be operated.

Several days later, according to Mrs. Casinelli, while sitting at her desk in her office, Jeremiah burst into the room with a frightening look in his eyes. Mrs. Casinelli phoned the police while Jeremiah proceeded to run into the factory. Shortly thereafter Jeremiah came out of the factory and ran back out the door, while Mrs. Casinelli was still on the phone with the police. At that point, Mr. Casinelli, who had been out of

the office, returned. After Mrs. Casinelli informed him of Jeremiah's actions, Mr. Casinelli closed and locked with a deadbolt, the main entrance door to the building.[1]

Within a few minutes, Jeremiah returned, ax in hand, and banged on the main door until it opened. Holding the ax with both hands, Jeremiah again burst into the Casinellis' office, "stormed" past the Casinellis and into the factory to the air-conditioning units, and began hacking at the on-off switches with the ax. Jeremiah succeeded in shutting both units down. Upon returning to the Casinellis' office, Jeremiah stopped at Mr. Casinelli's desk, and with ax in hand, told Mr. Casinelli, "I'm not done with you yet, sucker. The next time this is for you." Jeremiah then ran out the door.[2]

Jeremiah's testimony differed in that he stated that he and a few of his maintenance workers went to the Casinellis' office, where Mrs. Casinelli, after spotting them, tried to keep them out until she could shut down the air-conditioning units. Jeremiah stated that he forced open the door to the office, walked back to where the units were located and observed that the electrical boxes around the on-off switches had been mutilated, and the air-conditioning units were being operated. Jeremiah further stated that wanting to shut down the air conditioners without cutting off all the electricity, he left to get a fire ax in order to chop the wires on the electrical boxes. Upon returning, he saw that the Casinellis were trying to shut the main door to the building, which he then forced open. Jeremiah stated that he then went directly to the air-conditioning units, and smashed the electrical boxes with the ax, disabling the units. On his way out of the building, Jeremiah acknowledged that he stopped at Mr. Casinelli's desk, but told him, "That will teach you to screw with me." He denied making any threatening gestures toward Mr. Casinelli.

At the close of all the evidence, Jeremiah moved for a judgment of acquittal on all counts. As to the assault charge, Jeremiah argued that since there was no direct evidence from Mr. Casinelli that he was placed in fear, the assault charge could not stand. As to the breaking and entering counts, Jeremiah argued that under the lease, he had authority to enter the premises. The trial justice denied the motions and the jury returned guilty verdicts on all three counts. Thereafter, Jeremiah's motion for a new trial was denied and Jeremiah was sentenced to one-year supervised probation on each count to run concurrently. As to counts 2 and 3, the breaking and entering charges, Jeremiah was fined $300 on each count, for a total of $600 to be paid to the Violent Crimes Indemnity Fund in addition to the statutory amount.

The defendant raises several issues on appeal. Further facts will be supplied as necessary to a determination of the issues.

## I

WHETHER THE TRIAL JUSTICE ERRED IN DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL ON THE CHARGE OF ASSAULT WITH A DANGEROUS WEAPON

The standard to be applied in respect to a motion for judgment of acquittal has often

---

1. Apparently, there are two entrances to the offices of Gennaro. In order to get to the second floor of the complex, where Gennaro is located, it is necessary to walk through a courtyard to an outside door which leads to a stairwell. That outside door is left open during the day, but is locked at night. Once up the stairwell to the second floor, there is a main entrance that leads to a foyer. The main entrance has a "heavy duty door" which is left open during regular business hours. Upon that door is a sign which says "Gennaro, Inc." Inside the foyer are two other entrances: one that leads into the factory and one that leads into the office. Those two doors are kept locked.

2. This factual situation differs markedly from the classic example given in *Tuberville v. Savage*, 1 Mod. Rep. 3, 86 Eng. 684 (1669) in which the court expressed the proposition "If a man lay his hand upon his sword and say, 'If it were not assize-time, I would not take such language,' this is no assault." Here the ax was presented in an immediately threatening fashion at the victim within a distance at which imminent peril might be apprehended. In *Tuberville* the sword was not removed from the scabbard, nor was it presented in a threatening manner to the victim. In the case at bar, although the words may have indicated future action, the threatening demeanor and the towering rage would create a well-founded fear of immediate execution.

been stated. The trial justice must consider only that evidence which the prosecution claims is capable of generating proof beyond a reasonable doubt. Such evidence is to be viewed in the light most favorable to the state, and the trial justice must draw therefrom all reasonable inferences that are consistent with the guilt of the accused. Further, neither the weight of the evidence nor the credibility of the witness may be considered in passing upon such a motion. *State v. Lemon*, 497 A.2d 713, 718 (R.I. 1985); *State v. Romano*, 456 A.2d 746, 756–57 (R.I. 1983).

█ Jeremiah claims that the trial justice should have granted his motion for judgment of acquittal in the absence of any testimony by the state that Jeremiah performed any present overt act that was intended to harm either Mr. or Mrs. Casinelli. Jeremiah argues that the only testimony from which any fear by or threat to the well-being of the Casinellis could be inferred, relate to the words spoken by, and not the acts of, Jeremiah.

The standard definition of criminal assault in this jurisdiction from which the current case law has evolved is set forth in *State v. Baker*, 20 R.I. 275, 277, 38 A. 653, 654 (1897): "An assault, as ordinarily defined, is any unlawful attempt or offer, with force or violence, to do a corporal hurt to another, whether from malice or wantonness. The offence may consist, also, in putting another in fear of violence."

In *Baker* this court also recognized that "[t]o constitute an assault with a dangerous weapon it is necessary that the weapon should be presented at the party intended to be assaulted, within the distance at which it may do execution." 20 R.I. at 278, 38 A. at 654; *accord, State v. Barella*, 73 R.I. 367, 375, 56 A.2d 185, 188–89 (1947). In *State v. Milazzo*, 116 R.I. 443, 447, 358 A.2d 35, 37 (1976), we reaffirmed the principle that the actual present ability of the defendant to inflict harm on the victim by using a dangerous weapon is an element of the offense of assault with a dangerous weapon. *See State v. Ashness*, 461 A.2d 659, 665 (R.I. 1983).

There can be little doubt, in the facts of the instant case, that there was an actual present ability on the part of Jeremiah to inflict harm on Mr. Casinelli. Jeremiah was standing in close proximity to Mr. Casinelli, holding an ax in both of his hands. Mrs. Casinelli testified that Jeremiah was in a rage, a fact that the defense does not dispute, and that there was movement of the ax as he held it.

Jeremiah further argues that the state failed to prove that there was any apprehension or fear on the part of Mr. Casinelli. This court has previously held that apprehension and fear are not elements which must be shown to sustain a charge of criminal assault. In *State v. Boudreau*, 113 R.I. 497, 322 A.2d 626 (1974), the defendant was convicted of eight counts of assault with a dangerous weapon and one count of committing a crime of violence while armed with a pistol. The evidence showed that he fired shots into the victim's home in the early hours of the morning, at which time none of the victims were aware of the shots being fired. This court found that "[t]he guilt or innocence of a person charged with assault depends entirely upon what the wrongdoer does and intends and not at all upon what the other apprehends, or does not apprehend." *Id.* at 501, 322 A.2d at 628. In *State v. Aptt*, 441 A.2d 824, 827 (R.I. 1982), we reiterated the concept that the victim's apprehension of danger is not an element of criminal assault.

█ More recently, in *State v. Ashness*, we defined assault as an "unlawful attempt or offer, with force or violence, to do a corporal hurt to another [or to put] * * * another in fear of violence." 461 A.2d at 665 (quoting *State v. Baker*, 20 R.I. at 277, 38 A. at 654). Moreover, when that attempt is made so that there is "the actual present ability of the defendant to inflict harm on the victim by using a dangerous weapon," then the act constitutes assault with a dangerous weapon. *Ashness*, 461 A.2d at 665. *See State v. Lemon*, 497 A.2d at 719 n.1. Thus the current posture of our case law, as it relates to the offense of assault with a dangerous weapon, can be stated as any unlawful offer to do corporal

injury to another under such circumstances as may create a reasonable apprehension of immediate injury unless the person so threatened takes action or inaction to avoid it, coupled with a present ability to carry the offer into effect. Accordingly, it is not a necessary element of the offense that the state prove that the victim was actually put in apprehension or fear of immediate injury, only that the actions of the defendant were such that they would have created a well-founded fear or apprehension of an immediate injury on the part of a reasonable person who was confronted with the same or similar conduct. Thus, the test is objective, using a reasonable person as the standard rather than the subjective reaction of the victim in a particular case.

In the instant case, it is clear that the words and actions of Jeremiah, taken together, created an extremely tense and potentially volatile situation during which a person in Mr. Casinelli's situation may have been subjected to a reasonable apprehension of immediate injury, in light of Jeremiah's actual present ability to inflict injury with the ax.

In addition, Jeremiah raises the question whether an ax is a dangerous weapon. Jeremiah relies on our decision in *State v. Mercier*, 415 A.2d 465 (R.I. 1980), in which we held:

> "The test is not whether serious bodily harm results, rather it is whether the object was so used that serious bodily harm *may have resulted*. The object's latent capability alone is not determinative; what is determinative is such capability coupled with the manner of use." (Emphasis added.) *Id.* at 467.

■ Jeremiah argues that since he did not threaten Mr. Casinelli with the ax, it is not a dangerous weapon. Since we have already addressed the assault with a dangerous weapon issue at length, there is no need to further belabor the point other than to say that Jeremiah's actions with the ax most certainly could be characterized as threatening. Moreover, in *Mercier*, we acknowledged that "there are some items that in and of themselves constitute dangerous weapons, such as knives or loaded guns * * * ." 415 A.2d at 466. Common sense dictates that if a knife is considered a dangerous weapon per se, then an ax most certainly falls within that category. Viewed in the light most favorable to the state, Jeremiah's acts could be determined by a reasonable trier of fact to have constituted an assault with a dangerous weapon that was designed to place the victim in fear of imminent bodily harm. Thus, the trial justice committed no error in denying Jeremiah's motion for judgment of acquittal on the charge of assault with a dangerous weapon.

## II

## WHETHER JEREMIAH WAS LEGALLY GUILTY OF BREAKING AND ENTERING

Jeremiah was convicted of two counts of unlawful breaking and entering in the daytime in violation of G.L. 1956 (1981 Reenactment) § 11–8–5.1, which provides that

> "[e]very person who shall break and enter any bank, shop, office or warehouse, not adjoining to or occupied as a dwelling house, any meeting house, church, chapel, courthouse, town house, college, academy, schoolhouse, library or other building erected for public use or occupied for any purpose or any ship or vessel during the daytime, shall be imprisoned not more than three (3) years or fined not more than three hundred dollars ($300), or shall suffer both such fine and imprisonment."

■ There is no dispute that on the date in question, Jeremiah broke into and entered the premises leased and occupied by the Casinellis. However, Jeremiah argues that he did so under a claim of right and accordingly, he argues that his "entry" was not unlawful. In support of his position, Jeremiah first claims that the trial justice, in her charge to the jury, did not sufficiently explain the meaning of the word "unlawful." In her charge, the trial justice stated, "to break means to exert force to gain an entrance. Entry is the unlawful making of one's way into a building." According to Jeremiah, "unlawful"

should have been defined as "with intent to commit a crime," rather than being left to speculation by the jury.

A review of § 11–8–5.1 reveals that intent to commit a crime is not explicitly required as an element of the offense. The statute requires nothing more than an unlawful breaking and entering, and the trial justice's instructions reflect this fact. By contrast, §§ 11–8–4 and 11–8–5, which also relate to breaking and entering offenses, include felonious or criminal intent as an element of those offenses.[3] However, the penalties attendant to those crimes are imprisonment up to ten years, whereas, the penalty for violation of § 11–8–5.1 is imprisonment for not more than three years and/or a $300 fine. Thus the more severe penalties attendant to convictions under §§ 11–8–4 and 11–8–5 are reflected by the more onerous burden placed upon the state to prove specific intent to commit a felony or other crime under those statutes. However, as a general-intent crime, all that is necessary for a conviction under § 11–8–5.1 is proof of an unlawful breaking and entry. The lesser burden placed upon the state under this statute is reflected in the lesser penalty attendant to the crime. Accordingly we find that the trial justice did not err in her instructions to the jury.

■ Jeremiah also argues that § 11–8–5.1 is unconstitutionally vague because it contains no language regarding intent of the wrongdoer or consent of the occupant of the premises. It is well settled in this jurisdiction that a defendant in a criminal case cannot challenge the constitutionality of a statute in this court unless he has first raised the issue on the record before the trial court with particularity and

clarity. *State v. Lerner*, 112 R.I. 62, 81, 308 A. 2d 324, 337 (1973). A thorough review of the record reveals that Jeremiah failed to challenge the constitutionality of the statute before the trial court. Accordingly, we will not address that issue for the first time on appeal.

■ Finally, Jeremiah asserts that he had the right under the lease to enter the premises. In the alternative, Jeremiah argues that he cannot be found guilty of breaking and entering premises that he owns.

Under the terms of the lease negotiated by Stephen Casinelli and the previous owner of the property, Jeremiah succeeded to the right to enter the leased premises "at all reasonable times." It is doubtful that in their negotiations either party intended that bursting through two locked doors, albeit during working hours, while wielding an ax and exhibiting generally uncontrolled behavior to be within the terms of the right to enter under the lease.

Finally, the record discloses that there may have been a misunderstanding regarding the exact location of the area contemplated in the lease agreement. In his testimony, Jeremiah did indicate that the Casinellis wrongfully occupied a portion of Building no. 24. Nevertheless, it strains credulity to accept his contention that the office immediately behind the inner door to the leased premises was not properly occupied by the Casinellis. This area had been physically pointed out by the prior landlord and had been quietly enjoyed by the tenants for more than a year. Moreover,

---

**3.** General Laws 1956 (1981 Reenactment) § 11–8–4 provides:

"Breaking and entering business place, public building, or ship at night with felonious intent.—Every person who shall break and enter any bank, shop, office or warehouse, not adjoining to or occupied as a dwelling house, any meeting house, church, chapel, courthouse, town house, college, academy, schoolhouse, library or other building erected for public use or occupied for any public purpose or any ship or vessel, in the nighttime, *with intent to commit murder, rape, robbery or larceny, shall be imprisoned not exceeding ten (10) years.*" (Emphasis added.)

Section 11–8–5 provides:
"Breaking and entering other buildings with criminal intent—Railroad cars.—Every person who shall break and enter or enter in the nighttime, with intent to commit larceny or any felony or misdemeanor therein, any barn, stable, carriage house, or other building, for *the breaking and entering or entering of* which with intent aforesaid no punishment is otherwise prescribed by this title, and every person who shall at any time break and enter or enter any railroad car or break any lock or seal thereon *with intent to commit larceny or other crime, shall be imprisoned not exceeding ten (10) years.*" (Emphasis added.)

there is no indication that Jeremiah ever requested that the Casinellis abandon occupancy of the space perceived by Jeremiah to be in violation of the agreement or that Jeremiah ever took any legal action to evict the Casinellis from that space. Accordingly, the Casinellis as lessees and occupants of the premises could expect to be shielded from violent intrusions and particularly intrusions of the magnitude exhibited by Jeremiah.

For the reasons stated, the defendant's appeal is denied and dismissed. The judgment of conviction is affirmed, and the papers in the case may be remanded to the Superior Court.