**STATE**

v.

**Arthur ANDRADE.**

No. 94–128–CA.

Supreme Court of Rhode Island.

April 24, 1995.

[black redaction boxes]

Jeffrey Pine, Atty. Gen., Andrea Mendes, Sp. Asst. Atty. Gen., Aaron Weisman, Asst. Atty. Gen., for plaintiff.

Richard Casparian, Public Defender, Janice Weisfeld, Paula Rosin, Asst. Public Defenders, for defendant.

## OPINION

LEDERBERG, Justice.

This case came before the Supreme Court on the appeal of Arthur Andrade (defendant) from judgments of conviction on counts of assault with intent to commit robbery (count 1), assault with a dangerous weapon (count 2), entering a building with intent to commit robbery (count 3), and robbery (count 4). Although the grand jury indicted the defendant on thirteen counts, nine counts were severed from counts 1 through 4. After a jury trial in Superior Court, the defendant was sentenced to concurrent terms of twenty years each on counts 1 and 2, ten years on count 3, and fifty years, thirty to serve, twenty suspended and twenty years' probation, on count 4. The defendant was also sentenced to an additional consecutive term of five years as a habitual offender pursuant to G.L. 1956 (1994 Reenactment) § 12–19–21.

On appeal defendant argued that the trial justice should have suppressed the out-of-court and in-court identifications made by two witnesses because the identification procedures were unduly suggestive. The defendant further contended that the justice should have granted his motion for judgment of acquittal on counts 2 and 4 because there was no evidence that the gun defendant had used was a dangerous weapon. He also argued that the justice should have instructed the jury not to infer from the fact that the police had photographs of defendant that he had committed these or any other crimes. Last, defendant contended that the justice should have severed counts 1 and 2 from counts 3 and 4. We affirm the judgments.

The facts insofar as pertinent to this appeal follow.

## FACTS AND PROCEDURAL HISTORY

On December 10, 1991, at about 9:45 a.m., Sharro Perron (Perron) prepared to leave her Pawtucket apartment to go to work. As she came down the stairs, she was accosted by an armed intruder, who told her not to scream but to go down the basement stairs next to him; he pointed a silver gun at her chest five to six inches away. The intruder asked Perron if there were any drugs in the house, if she had any money, and whether a Spanish person lived on the second floor. When she answered his questions in the negative, he walked backward out of the basement, pointing the gun at her, and told her not to call the police.

Perron testified that the episode lasted about fifteen minutes in the well-lit basement, during which time she looked at the intruder, who was about one foot away from her. She described him as six feet tall, weighing about 175 to 180 pounds, having brownish-red hair, a slight beard and hazel/green eyes and wearing a black sweat shirt and black pants. Perron told the jury she was frightened because her life was threatened and because her eight-month-old baby was upstairs.

Perron testified that after the intruder left, she went to her landlord's apartment to call the police to report the incident. On December 19, 1991, two detectives came by her workplace to show her a set of photographs. After a brief glance at the photographs she picked out the intruder, whom she identified in court as defendant.

Less than a week after the assault and attempted robbery on Perron, Craig Duffin (Duffin) was asleep the morning of December 16, 1991, when he was awakened by a knock on the door of his Pawtucket apartment. A man he had never seen asked, "Is Michael here?" When Duffin answered "No," the man asked if he was on Japonica Street, and Duffin told him that Japonica was the next street over. The man, who was standing about four feet away, turned to leave, but quickly turned back and pointed at Duffin's

face a steel-gray firearm, which Duffin thought was probably a 9-millimeter pistol because it did not have a revolver barrel. The intruder told Duffin to lie down on the bed and asked him where his "stash" was located. When Duffin replied that he did not have any drugs, the intruder began to rifle through the bedroom closet, the dining room closet, and Duffin's bureau, from which he took about $100 in cash and a coffee can filled with change. While he was in the dining room, taking apart Duffin's stereo, the intruder said, "Today's your lucky day. I'm going to let you live." The intruder took money out of Duffin's girlfriend's purse, then read the name on Duffin's license and said, "I want to know your name. I want to know where you live. I want to know everything about you so that if you go to the police, I will send my brother back after you, and you won't like that."

The intruder then ordered Duffin off the bed, looked under the mattress for a gun, and told Duffin, "I'm going to shoot a hole in your mattress" but refrained when Duffin pleaded with him not to do so. The intruder then pointed the gun in his possession at Duffin, told him not to move, and added, "Give me five minutes."

Duffin testified that the lighting in the apartment was good, that he looked at the intruder for the ten minutes he was in Duffin's bedroom, and that although he lost sight of the intruder in the nearby dining room, Duffin could still hear him. Duffin described him as about five feet, ten inches tall with brown hair thinning on top, light olive skin, a two-day growth of beard, and a gold hoop earring in his left ear. Duffin stated that the intruder wore a black or dark-blue vest with red trim, a black sweat shirt, and black pants and spoke with an Hispanic accent.

After the intruder left, Duffin called the police. When the police arrived, Duffin gave them a statement and went down to the Pawtucket station where he unsuccessfully tried to build a composite drawing and then spent thirty to forty-five minutes pouring over hundreds of photographs. Duffin identified the intruder from a photograph and told the detective that the man "looked like the person who robbed him" but appeared to be younger than the intruder because in the photograph his hair was thicker and he weighed less. Detective Donald R. Beech (Beech) of the Pawtucket police department told him that the photo was taken in 1985 and that the man's name was Arthur Drury. Beech told Duffin that he would attempt to obtain another photograph.

Three days later, on December 19, 1991, Duffin returned to the police station to look at a photo array comprising six photos. After reviewing the photos for about three seconds, Duffin picked out a photo of the intruder. In court he identified defendant as the person who had entered his house and robbed him and testified that he was frightened when defendant was carrying out the robbery in his apartment.

Several other witnesses testified at trial. Cecilia Santos (Santos), who had had a child with defendant, testified that about two weeks before Christmas in 1991, defendant came to visit her. She noticed he had a silver gun in his trousers. When asked about it, defendant answered that "he had business to take care of." Santos testified that about two months before the November 1993 trial, defendant contacted her to learn what she had told the detectives and to convince her to say she saw defendant with a beeper, not a gun. She told defendant that she would not lie.

Kimberly Page (Page), defendant's girlfriend, testified as an alibi witness. According to Page, on December 16, 1991, defendant, who lived part of the time with her and part of the time with his sister, could not go to his construction job because he was ill with "the flu." Page testified that when his boss came by to drive defendant to work, she took him upstairs to see defendant. Page testified further that she had never seen defendant with a gun, that he did not speak with an Hispanic accent, and that he wore a gold post earring. Page also explained that although she knew defendant as Arthur Drury, defendant also used the surname Andrade, the surname of the man who had married his mother.

John Phillip Somyk (Somyk), defendant's employer, who had known him for about

eight years, testified that on December 16, 1991, when he attempted to pick up defendant to drive him to work, defendant was sick. He verified this date with defendant several weeks later, after defendant had been arrested. Somyk stated that he did not have records of the date he went to pick defendant up or of defendant's work dates because he had discarded his old calendar and he paid defendant "under the table." Somyk also testified that defendant did not speak with an Hispanic accent and Somyk did not recall whether defendant wore an earring.

At the conclusion of the state's evidence, the trial justice denied defendant's motion for judgment of acquittal. Before trial, counts 5 through 12 were severed from counts 1 through 4, and during trial, count 13 was severed by agreement of the parties. The jury reached a verdict of guilty on the first four counts. The trial justice denied defendant's motion for a new trial and sentenced defendant, who filed a timely notice of appeal and waived his right to file a prebriefing memorandum.

## ISSUES ON APPEAL

### Motion to Suppress Identifications

On appeal defendant claimed that the trial justice erred in denying his motion to suppress the out-of-court and in-court identifications made by Perron and Duffin because the identification procedures were unduly suggestive and resulted in mistaken identifications. The defendant specifically contended that the following procedures were impermissibly suggestive: Beech's statements to Duffin about defendant, the use of defendant's photograph in two photo arrays, and the placement and quality of defendant's photograph in the array. On December 16, 1991, Beech informed Duffin that the photo Duffin identified at the station was a photo from 1985, that the man used an alias, and that there was a warrant out for his arrest.

The defendant also complained that of the six photos in the array, only defendant's photo was included in the files and albums that Duffin had perused at the station on December 16, 1991. Apparently, the detective who compiled the photo array obtained the five

other photos from files in a different office, and these five photos were not included in the files and albums Duffin initially reviewed. Moreover, defendant complained that his photograph was placed in the center of the top row of the array and that the five other photos, which had been slightly enlarged for the array, were necessarily of lesser quality and showed the other men from the chest up, whereas defendant's photograph was sharper and showed him from the neck up.

In determining whether the procedures surrounding the identifications are unduly suggestive, this court must determine whether the totality of the circumstances discloses procedures that were "so unnecessarily suggestive and conducive to irreparable mistaken identification that it constituted a denial of due process of law." *Manson v. Brathwaite*, 432 U.S. 98, 104, 97 S.Ct. 2243, 2248, 53 L.Ed.2d 140, 147 (1977); *see State v. Camirand*, 572 A.2d 290, 293 (R.I.1990). Even in the event that the procedures are found to be unduly suggestive, however, "[t]he admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability." *Manson*, 432 U.S. at 106, 97 S.Ct. at 2249, 53 L.Ed.2d at 149; *Camirand*, 572 A.2d at 293.

After applying this two-part test, we are of the opinion that the trial justice correctly denied the motion to suppress the identifications. Neither the statements Beech made to Duffin nor the placement and quality of defendant's photo in the array shown to Duffin and Perron were unnecessarily suggestive. The trial justice observed that in all six comparison photos the subjects were similar; in fact, the justice "compliment[ed] the Pawtucket Police for the great pains taken with the six photos making up the array."

Although defendant's photo was the only one that was presented in both photo arrays, *see Camirand*, 572 A.2d at 294, the totality of the circumstances did not give rise to a substantial likelihood of misidentification because, unlike the cases relied on by defendant, Duffin did not hesitate when he initially

identified the photo on December 16, 1991. *See State v. Nicoletti*, 471 A.2d 613, 616 (R.I.1984). After viewing the six-year-old photograph of defendant, Duffin stated to Beech that it "looked like the person who robbed him," but he "appeared to be younger than the person that was in my house that day in that the hair on top of his head was thicker and he appeared to be a little thinner." Beech testified that Duffin was positive of the identification, but the detective wanted to obtain a more recent photo before he issued an arrest warrant because, "I like to be on the safe side and be a hundred percent sure * * *. Mr. Duffin was positive. I was not at the time one hundred percent positive." Moreover, when the detective showed Duffin the photo array, which included a more recent photo of defendant, Duffin viewed it only two or three seconds before he selected defendant's photo. Thus, the trial justice properly found that the possibility of misidentification was unlikely.

Furthermore, Duffin's identification had a high degree of reliability, "the linchpin in determining the admissibility of identification testimony." *Manson*, 432 U.S. at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154. Factors that determine reliability include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Id.; see Camirand*, 572 A.2d at 294. Applying these factors to the instant case, we conclude that Duffin viewed and paid close attention to the intruder for ten minutes and accurately described the robber to the detectives later that morning, demonstrating certainty in his identification. Finally, the length of time between the crime and the first identification, i.e., the "confrontation," was a matter of hours, and the time between the crime and the second confrontation was three days. Clearly, Duffin's memory was "fresh and at the peak of [his] reliability." *State v. Turner*, 561 A.2d 869, 872 (R.I.1989). Therefore, we conclude that the trial justice correctly denied defendant's motion to suppress the out-of-court and in-court identifications by Perron and Duffin.

## Motion for Judgment of Acquittal

The defendant next asserted that the trial justice erred in denying his motion for judgment of acquittal of assault with a dangerous weapon and of first degree robbery because there was no evidence the gun allegedly used was a dangerous weapon. In reviewing a ruling on a motion for judgment of acquittal, this court applies the same standard as the trial justice, who "must view the evidence in the light most favorable to the state, without weighing the evidence or assessing the credibility of the witnesses and draw all reasonable inferences that are consistent with guilt." *State v. Henshaw*, 557 A.2d 1204, 1206 (R.I.1989). Unless the evidence viewed in such a light is insufficient to warrant a verdict of guilty beyond a reasonable doubt by the jury, the motion should be denied. *Id.* at 1206–07.

At trial the state did not introduce a gun into evidence and apparently never recovered the gun that defendant had brandished. During the search of the apartment of defendant's sister, officers seized a black and brown gun with the words "John Wayne" on it, which defendant's sister stated belonged to her boyfriend. This seized gun was a "show" gun, inoperable because it had been plugged up, and undoubtedly not the one defendant had used during the incidents because Perron described that gun as a silver, square gun, whereas Duffin described it as a 9–millimeter steel-gray pistol.

The defendant argued, however, that the trial justice should have granted the motion for judgment of acquittal because the state did not introduce a weapon into evidence and because there was no evidence that defendant threatened to bludgeon Perron or Duffin with the gun or that the gun was even operable. The crimes of assault with a dangerous weapon or first degree robbery, defendant contended, include as an element the actual, present ability to inflict harm on the victim by means of a dangerous weapon. General Laws 1956 (1981 Reenactment) § 11–5–3, as amended by P.L.1991, ch. 324, § 1 and § 11–39–1, as amended by P.L.1991, ch. 201, § 1.

■ With this contention we must disagree. Our holding in *State v. Mercier,* 415 A.2d 465, 467 (R.I.1980), pointed out:

> "[T]here may be a conviction of assault with a dangerous weapon when the object used in the assault is not per se a dangerous weapon if it appears that the object was used in such a way that it had the capability of producing serious bodily harm. The test is not whether serious bodily harm results, rather it is whether the object was so used that serious bodily harm may have resulted. The object's latent capability alone is not determinative; what is determinative is such capability coupled with the manner of use."

In addition, we noted in *State v. Jeremiah,* 546 A.2d 183, 186–87 (R.I.1988), that the Rhode Island law regarding assault with a dangerous weapon can be stated as:

> "[A]ny unlawful offer to do corporal injury to another *under such circumstances as may create a reasonable apprehension of immediate injury* unless the person so threatened takes action or inaction to avoid it, coupled with a present ability to carry the offer into effect." (Emphasis added.)

Under our application of the rule both in *Mercier* and *Jeremiah,* it is apparent that the jury could have inferred that defendant inflicted assault, and by implication first-degree robbery, with a dangerous weapon. Both Perron and Duffin testified that they were frightened: Perron testified that defendant had aimed the gun at her only five to six inches away from her chest, and Duffin testified that defendant had pointed the gun at his face and said, "I'm going to shoot a hole in your mattress." The defendant told Duffin, "Today is your lucky day. I'm going to let you live." Upon departing from the encounters, defendant again pointed the gun at the two victims, told Perron not to call the police, and told Duffin not to move but to "give me five minutes." Although the state did not introduce the weapon into evidence, the jury could nevertheless infer that defendant had wielded an operative pistol on the basis of his actions and statements. Thus, the trial justice properly denied defendant's motion for judgment of acquittal.

## Jury Instruction

■ The defendant next argued that the trial court erred in failing to instruct the jury that it should not infer that defendant had committed this or other crimes simply because police had photographs of him. The defendant submitted a request modeled after the Manual of Model Jury Instructions for the Ninth Circuit, § 2.09 (West 1985):

> "There has been testimony that a photograph or photographs of Mr. Andrade were shown to witnesses by police. The police collect pictures of many people from many different sources and for many different purposes. The fact that the police had Mr. Andrade's picture does not mean that the defendant committed this or any other crime."

We are of the opinion that as a matter of course trial justices should include such caveats in their instructions to a jury. In the instant case, however, the failure to so instruct the jury was not reversible error. *See Russian v. Lipet,* 103 R.I. 461, 467, 238 A.2d 369, 373 (1968) (court's failure to instruct jury to disregard testimony not prejudicial error).

## Severing of Counts

Last, the defendant argued that the trial justice committed plain error by not severing counts 1 and 2 (the Perron incident) from counts 3 and 4 (the Duffin incident). The state correctly pointed out, however, and the defendant conceded, that during the hearing on the motion to sever, counsel for the defendant admitted that counts 1 through 4 were properly joined. Thus, the defendant has waived this issue on appeal. *State v. Cline,* 122 R.I. 297, 328, 405 A.2d 1192, 1209 (1979). Moreover, the defendant's contention that the trial justice's erroneous failure to sever the counts can be remedied by this court under the plain-error doctrine is unfounded. We shall consider errors not asserted in the trial court only in "extraordinary circumstances, such as where a defendant's basic constitutional rights have been abridged," and when a defendant fails to object to a new rule of law. *State v. McMaugh,* 512 A.2d 824, 829 (R.I.1986). We hold that no such abridgment occurred in this case and con-

clude that no error was committed by the trial justice in not severing the cases.

Accordingly, the defendant's appeal is denied and dismissed, the judgment appealed from is affirmed, and the papers in the case may be returned to the Superior Court.