**STATE,**

v.

**Tremayne CLIFTON.**

**No. 99–157–C.A.**

Supreme Court of Rhode Island.

June 1, 2001.

Virginia M. McGinn, Aaron L. Weisman, Providence, For Plaintiff.

Kelly Monteiro, Paula Rosin, Providence, For Defendant.

Present WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

This appeal from a murder conviction raises two issues: (1) whether the evidence to support an assault-with-a-dangerous-weapon charge was sufficient to survive a motion for judgment of acquittal, and (2) whether the trial justice erred in ruling that the state had shown good cause to extend the 120–day–trial deadline of the Interstate Agreement on Detainers Act (IADA), G.L.1956 chapter 13 of title 13. On June 5, 1998, a jury found the defendant, Tremayne Clifton, guilty of first-degree murder, assault with a dangerous weapon, and carrying a pistol without a license. Clifton now appeals from the judgment of conviction, arguing that the trial justice erred in denying (1) his motion for judgment of acquittal on the assault-with-a-dangerous-weapon charge, and (2) his pretrial motion to dismiss the charges against him for the state's alleged violation of IADA's 120–day trial deadline.

### Facts and Travel

Around noon on August 11, 1995, Jamal Collins picked up Joel Brown in a borrowed four-door Jeep truck. After driving around for several hours, the two men espied Clifton, whom they both knew, at Mary Fogarty Elementary School in Providence. Apparently, Clifton and Collins had recently fought over their drug-dealing activities. After a short conversation with Collins, Clifton joined the pair in the Jeep, sitting in the back seat behind Collins. Collins drove the vehicle while Brown sat in the front passenger seat. After driving for a short time, the Jeep arrived on Cahill Street, near the Mount Zion Church of God. As the Jeep rounded the corner from Cahill onto Swan Street, several gunshots burst from the back seat, where Clifton was seated, causing Brown to leap out of the Jeep. As he did so, he saw Collins' head, which was bleeding, hit the steering wheel. Brown also noticed that Collins' body was shaking.

After shooting Collins in the back of the head, Clifton jumped out of the Jeep and ran up Cahill Street. As he ran, Clifton

passed the house of thirteen-year-old David Ferrer. David and his friend, Matt Omisore, were dropping off a bike frame at the house. The Ferrer house was "[a]bout a block and a half" from the intersection where the shooting occurred. Just before he heard the gunfire, David went inside the house and Matt remained outside on the sidewalk across the street in front of the house. Once inside, David saw the Jeep take the corner through the kitchen window, and he heard five or six gunshots. After witnessing the shooting from his kitchen window (which faced down Cahill Street towards Swan Street), David went back outside. He recognized Clifton (although he did not know his name) from the neighborhood because Clifton's aunt lived diagonally across Cahill Street from Ferrer. From his vantage point on the front porch, David saw Clifton point a gun at Matt as Clifton ran by the house. David then proceeded down the street to the murder scene, where he recognized the victim (Collins) as a friend of his cousin. He then left the scene and gave a statement to the police. He also identified Clifton as the shooter from a photographic array that the police presented to him. Nevertheless, he did not identify Clifton as the shooter at the pretrial hearing.

Brown waited by the Jeep until the police arrived and then went with them to the station to relate what he had observed. While he was at the station, the police showed Brown a photographic array of potential suspects; from the display, Brown picked out Clifton's photograph as the person who shot Collins.

Matt also testified that he heard several shots, saw the Jeep run into a fence, and then watched as the shooter left the Jeep and ran toward David's house. Matt explained that Clifton slowed down as he approached the house and "put a gun in

my face; pointed it towards me." Clifton said nothing to him as he did so. Eventually, however, he lowered the gun and continued running toward a house just beyond the Ferrer's. Matt gave a statement to the police concerning the incident and described the gun as a small black automatic pistol with a brown handle. However, he did not identify Clifton from a pretrial photographic array.

On March 26, 1996, the state indicted Clifton on charges of murder in the first degree, assault with a dangerous weapon, and carrying a pistol without a license. Because Clifton was already serving a prison sentence in North Carolina, the state invoked IADA to secure Clifton's return to Rhode Island so he could stand trial here. Pursuant to IADA and at the state's request, he arrived in Rhode Island on December 12, 1997. He pled not guilty at his arraignment on December 16, 1997, and the court appointed the Rhode Island Public Defender's Office as counsel for his defense. On January 13, 1998, an attorney from that office entered an appearance on Clifton's behalf.

During the next few months, the prosecution and the defense sought discovery of certain items pursuant to Rule 16 of the Superior Court Rules of Criminal Procedure. On February 2, 1998, the state sent a discovery request to defendant. That request asked Clifton to provide any documents, photographs, recordings, tangible objects or places intended for use by Clifton as evidence at trial. The request also asked for any reports of physical, mental, or scientific examinations or experiments, as well as a list of witnesses and any witness statements in Clifton's possession. The state also asked Clifton to provide a detailed alibi statement if he intended to rely on one at trial. Clifton did not respond to this request until May 11, 1998, stating that he had no discovery to provide

and that he did not intend to rely on the defense of alibi.

During this same time period, the prosecutor obtained, on four separate occasions, the postponement of a pretrial conference. He did so because his trial responsibilities on another case allegedly prevented him from completing the trial-preparation work on this case that was necessary before he would be ready to attend a pretrial conference. On March 3, 1998, the court finally held a pretrial conference, passed the case for trial, and assigned a date certain for trial on May 18, 1998, well beyond IADA's 120–day deadline. Then, on March 13, 1998, about one month before the expiration of IADA's 120–day trial deadline, the court heard the state's motion to enlarge the 120–day period under IADA for bringing the case to trial. At that hearing, the state explained that the initial prosecutor assigned to the case "unexpectedly left the office" after the state had finalized arrangements to have Clifton brought back to Rhode Island. The new prosecutor assigned to the case, the state pleaded, needed more time to prepare for the ensuing trial because of his other preexisting case assignments. In addition, the state suggested, discovery remained incomplete. The state indicated that it required testimony from an out-of-state witness who had to be subpoenaed one month in advance. At the close of the hearing, over Clifton's objection, the trial justice granted a ninety-day extension. On May 7, 1998 (146 days after the defendant had arrived in Rhode Island), Clifton moved to dismiss the case for the state's failure to try the charges against him within 120 days of bringing him back into the state under IADA. The trial justice denied that motion, and a jury trial commenced on June 2, 1998.

At the close of all the evidence, Clifton moved for judgment of acquittal on the charge of assault with a dangerous weapon. He argued that the testimony of the two boys, David and Matt, failed to establish whether they had observed him with a gun and that they had failed to identify him as the perpetrator of the assault. He also argued that the evidence failed to establish each of the required elements of the charge of assault with a dangerous weapon. After hearing arguments, the trial justice denied the motion. On June 5, 1998, the jury convicted defendant as charged.

### Analysis

Clifton presses two claims of error on appeal. First, he argues that the trial justice erred in denying his motion for judgment of acquittal on the charge of assault with a dangerous weapon. The evidence submitted at trial, Clifton insists, failed to prove each of the three elements of the charge beyond a reasonable doubt. Second, the trial justice erred, Clifton contends, in denying his motion to dismiss because the state failed to try him within the 120 days required under IADA, and because the state lacked good cause for the delay.

### I

### Motion for Judgment of Acquittal

▌ Whenever we review the denial of a motion for judgment of acquittal, we apply the same standard as the trial justice. *See State v. Mollicone*, 654 A.2d 311, 319 (R.I.1995). In ruling on this motion, the trial justice "must view the evidence in the light most favorable to the state, without weighing the evidence or assessing the credibility of the witnesses, and must draw therefrom all reasonable inferences consistent with guilt." *State v. Evans*, 742 A.2d 715, 721 (R.I.1999) (quoting *State v. Tempest*, 651 A.2d 1198, 1216–17 (R.I.1995)); *see also* Super. R.Crim. P. 29(a). View-

ing the evidence in this light, if the evidence could sustain a guilty verdict by the jury, the trial justice should deny the motion. *See State v. Mattatall*, 603 A.2d 1098, 1105 (R.I.1992).

General Laws 1956 § 11–5–2(a) classifies assault with a dangerous weapon as a felony assault. This crime requires proof of the following elements: "[1] any unlawful offer to do corporal injury to another [2] under such circumstances as may create a reasonable apprehension of immediate injury unless the person so threatened takes action or inaction to avoid it, coupled with [3] a present ability to carry the offer into effect." *State v. Jeremiah*, 546 A.2d 183, 186–87 (R.I.1988); *see also State v. Lemon*, 497 A.2d 713, 719 n. 1 (R.I.1985); *State v. Ashness*, 461 A.2d 659, 665 (R.I.1983).

Clifton first argues that the state's evidence failed to prove an "unlawful offer to do corporal injury to another" beyond a reasonable doubt. He suggests that his conduct towards Matt amounted to no more than "a reflex" as he caught sight of David and Matt while he ran by them. He contends that this "reflexive movement" does not support an inference of the criminal intent required to sustain a conviction. We disagree and hold that, in light of the factual circumstances in this case, the evidence concerning Clifton's conduct, when viewed most favorably to the state, could satisfy the criminal-intent element of the crime. After discharging his weapon less than two blocks away by pumping multiple bullets into the victim's head, Clifton immediately ran up the street, then slowed down as he approached the Ferrer house, lifted his gun, and pointed it at Matt's face. This conduct could sufficiently support an objective inference that Clifton possessed the requisite criminal intent to harm one or both of these boys. *Cf. State v. Speaks*, 691 A.2d 547, 550–51 (R.I.1997) (sustaining conviction of assault with a dangerous

weapon when defendant pointed gun at infant son and threatened that neither mother nor DCYF would get the baby); *Ashness*, 461 A.2d at 665–66 (sustaining conviction of assault with a dangerous weapon when defendant indirectly threatened the victim by pointing gun at another person five feet away from the victim and firing two shots in that direction).

Clifton next contends that the evidence failed to prove that his actions created a reasonable apprehension of immediate injury. In evaluating the evidence on this score, we apply an objective test asking whether Clifton's actions "were such that they would have created a well-founded fear or apprehension of an immediate injury on the part of a reasonable person who was confronted with the same or similar conduct." *Jeremiah*, 546 A.2d at 187. This inquiry focuses solely upon the objective actions and demeanor of the wrongdoer in light of the circumstances. *See State v. Boudreau*, 113 R.I. 497, 501, 322 A.2d 626, 628 (1974) ("The guilt or innocence of a person charged with assault depends entirely upon what the wrongdoer does and intends and not at all upon what the other apprehends, or does not apprehend.").

Clifton suggests that our precedents require an evidentiary showing that he was in close proximity to the victim *and* that he had interacted threateningly with him to satisfy this element of the assault charge. We decline to interpret our past decisions on this subject so stintingly; indeed, our cases explicating the elements of this crime do not erect such rigid requirements of "close proximity" or "extended encounter" to prove the commission of this crime. Here, the state has shown that Clifton's actions, taken in their entirety and in light of the circumstances, would have produced a well-informed apprehension of immediate injury on the part of any reasonable indi-

viduals who were so unfortunate as to find themselves standing in the shoes of David and Matt when Clifton pointed the gun in their direction as he ran by them. *Cf. Speaks*, 691 A.2d at 550–51 (requiring only that "the actions of the defendant were such that they would have created a well-founded fear or apprehension of an immediate injury on the part of a reasonable person who was confronted with the same or similar conduct"); *Jeremiah*, 546 A.2d at 187 (same). Matt heard several shots emanate from the Jeep and then saw a man immediately leap from the vehicle and run towards him. As he approached, the man slowed down, turned his head, and then lifted and pointed his gun towards Matt's face. David's recounting of this event further corroborates Matt's version of the incident. A trier of fact could reasonably infer from this evidence that Clifton, by his actions, created a reasonable apprehension of immediate injury in both of these individuals. *Cf. Ashness*, 461 A.2d at 665–66 (explaining that robber's communication of a threat to one victim created a reasonable apprehension of immediate injury for all others in the room).

■ Lastly, Clifton argues that the state failed to prove that he had a present ability to carry his offer of injury into effect. He asserts that "the state failed to produce a weapon or any other evidence" to prove that he had an operable, loaded firearm; therefore, he suggests, it could not prove the element of present ability to harm. Our holding in *State v. Andrade*,

657 A.2d 538 (R.I.1995), however, combined with Matt's and David's testimony, effectively refutes this assertion. As in this case, *Andrade* involved an assault with a gun that the state never recovered. *Id.* at 539–40. Nevertheless, we held that one may infer the operability of a weapon from the overall context of the defendant's actions. Thus, in *Andrade* we affirmed the trial justice's denial of the defendant's motion for judgment of acquittal. *Id.* at 542–43. Here, David and Matt both testified that they saw and heard Clifton shoot the gun as he leapt from the Jeep. Moments later, Clifton pointed the weapon at Matt while he was fleeing from the murder scene. From this evidence, the jury could properly infer that Clifton had the present ability to carry out his threat. Thus, the trial justice properly denied Clifton's motion for judgment of acquittal.[1]

## II

### Motion to Dismiss

Clifton also contends that the trial justice abused his discretion in granting the state's motion for enlargement of time and in denying his motion to dismiss under IADA. Because his case was not heard within IADA's 120–day deadline, he argues that the state lacked good cause to justify the extension it obtained from the court to try him and that, therefore, the trial justice erred in granting this motion.

---

1. Recently, in *State v. Jackson*, 752 A.2d 5 (R.I.2000), we followed the teaching of *McLaughlin v. United States*, 476 U.S. 16, 17–18, 106 S.Ct. 1677, 1678, 90 L.Ed.2d 15, 18 (1986), and held that an operable but unloaded gun still constituted a "dangerous weapon" that could satisfy the "present ability" element of an assault with a dangerous weapon charge. *Jackson*, 752 A.2d at 9–10. The *Jackson* holding supersedes decisions like *State v. Andrade*, 657 A.2d 538 (R.I.1995), in situations involving an assault with an operable but unloaded gun. We decided in *Jackson*, however, to apply the *McLaughlin* rule prospectively since the defendant had no prior notice of the rule change. *Jackson*, 752 A.2d at 9–10. Likewise, because Clifton had no notice of our recently-announced *Jackson* rule during his 1998 trial, we apply the earlier *Andrade* analysis here for purposes of determining "present ability."

■ Chapter 13 of title 13 adopted IADA into Rhode Island law. Nearly all the states as well as the federal government have adopted IADA. First proposed in 1956, IADA enables a participating state to gain custody of a prisoner incarcerated in another jurisdiction to try him or her on criminal charges in the participating state. The basic purpose of IADA is to foster a productive and rehabilitative environment for a prisoner serving a sentence in one jurisdiction by encouraging and facilitating the expeditious disposition of charges pending against that prisoner in another jurisdiction. *See United States v. Mauro,* 436 U.S. 340, 351, 98 S.Ct. 1834, 1842, 56 L.Ed.2d 329, 341 (1978); *State v. Newman,* 117 R.I. 354, 358–59, 367 A.2d 200, 202–03 (1976).

■ As a congressionally sanctioned interstate compact, IADA rests its constitutional footing on the Compact Clause of the United States Constitution. Therefore, IADA is subject to construction under federal law. *See Carchman v. Nash,* 473 U.S. 716, 719, 105 S.Ct. 3401, 3403, 87 L.Ed.2d 516, 520 (1985); *Cuyler v. Adams,* 449 U.S. 433, 442, 101 S.Ct. 703, 709, 66 L.Ed.2d 641, 649–50 (1981); *State v. Williams,* 253 Neb. 619, 573 N.W.2d 106, 110 (1997); *State v. Burss,* 316 Or. 1, 848 P.2d 596, 598 (1993). The denial of a defendant's motion to dismiss an indictment under IADA is a question of law reviewed *de novo,* but we review factual findings underlying the decision for clear

error. *See Birdwell v. Skeen,* 983 F.2d 1332, 1336 (5th Cir.1993); *United States v. Hall,* 974 F.2d 1201, 1204 (9th Cir.1992); *Johnson v. State,* 900 S.W.2d 475, 479 (Tex.App.1995).

The relevant part of IADA provides:

"In respect of any proceeding made possible by this article, trial shall be commenced within one hundred and twenty (120) days of the arrival of the prisoner in the receiving state, but *for good cause shown* in open court, the prisoner or his or her counsel being present, *the court having jurisdiction of the matter may grant any necessary or reasonable continuance.*" Section 13–13–2, art. IV(c). (Emphasis added.)

Furthermore, § 13–13–2, art. V(c) provides for the dismissal with prejudice of any indictment not brought to trial in conformity with the above provision.

■ Neither side disputes that, pursuant to IADA, Clifton arrived in Rhode Island on December 12, 1997, and that his trial did not commence until June 2, 1998 (172 days later). Under the plain terms of IADA, his trial should have begun on or before April 11, 1998[2]—unless the state had shown good cause for a continuance.[3] The state contends that the reasons it proffered at the March 13, 1998 hearing on its motion for a continuance constituted good cause to justify the granting of the continuance and that the trial justice did not err in granting its motion.[4] The state

2. Because IADA does not contain its own provision concerning the computation of time for the various deadlines it prescribes, Rule 45(a) of the Superior Court Rules of Criminal Procedure instructs that the 120–day deadline would have expired as of April 11, 1998.

3. Given IADA's clear directive, we deem the trial justice's initial assignment of the case to a May 18 date certain for trial to be a nullity. Without a showing of "good cause" by the state in open court, the trial justice had no

authority to set a trial date beyond IADA's 120–day period. This decision of the trial justice, however, had no bearing on the court's later decision granting the state's motion (brought well within the statutory period) to enlarge the 120–day deadline, upon a proper showing of "good cause."

4. The March 13, 1998 hearing took place in open court with the participation of defendant's counsel.

pointed out that the prosecutor previously assigned to this case had departed unexpectedly from state employment. It also mentioned its need to subpoena an out-of-state witness and to complete pretrial discovery as justifications for the court's granting of the continuance.

Clifton contends, however, that good cause was lacking because all the delays resulted from the state's irresponsibility. He asserts that the state's excuse concerning the departed prosecutor "simply does not fly given the nature of the case" and given the time that still remained after the departure for the new prosecutor to complete pretrial preparation. Clifton also dismisses the state's other reasons for needing the extension relating to completion of pretrial discovery and to the subpoena of the out-of-state witness.

After considering these circumstances, we conclude that the state met its burden of showing good cause. Given that this case involved a complicated skein of events leading to multiple charges including first-degree murder, the state's assertion that it needed additional preparation time—especially in light of the unexpected departure of the previously assigned prosecutor and the newly assigned prosecutor's heavy workload of other cases—does not appear implausible or unworthy of good-cause recognition on this record. In addition, at the time of the March 13 hearing on the state's request for a continuance, discovery remained incomplete, and this state of affairs can be attributed, at least in substantial part, to the conduct of the defendant. The defendant acknowledges that the prosecu-

tion's request on February 2, 1998, for discovery remained unanswered until May 11.[5] When the state appeared before the trial justice on March 13, the prosecutor explained that the "[d]efense has not yet provided me with discovery." Because of these circumstances and without a showing of inexcusable neglect or dilatory tactics on the state's part, we conclude that the trial justice did not err in finding that good cause had been shown.[6]

### Conclusion

For these reasons, we deny the appeal and affirm the judgment of conviction.

GOLDBERG, Justice, concurring in part and dissenting in part.

I concur in the majority's conclusion upholding the denial of the defendant's motion for a judgment of acquittal. We part company, however, with respect to the Court's finding that the numerous and long continuances of the trial of this case, well beyond the maximum time period provided by the Interstate Agreement on Detainers Act, G.L.1956 chapter 13 of title 13 (IADA), were for "good cause shown," a mandatory requirement for an extension of the trial date beyond the statutory 120-day deadline. I dissent primarily because there has been no showing of good cause by the prosecution and certainly no finding of good cause by the hearing justice who granted the state's request for a continuance. I would remand this case for an evidentiary hearing on this issue.

---

5. Rule 16(g)(2) of the Superior Court Rules of Criminal Procedure provides that, upon being served with a request for discovery and inspection, the defendant shall respond to the request within fifteen days after service. Rule 16(i) authorizes the court to grant a continuance to remedy any failure to comply with the rule.

6. Clifton has not argued that the length of the continuance was unreasonable or unnecessary for purposes of IADA, nor that he suffered any additional or extraordinary prejudice (other than that caused by the delay itself) as a result of the court's granting of the continuance.

The record in this case demonstrates that Tremayne Clifton arrived in the state of Rhode Island on December 12, 1997, pursuant to the *state's request* for temporary custody of the out-of-state prisoner for purposes of trial on an indictment that had been pending for more than one and one-half years. He was arraigned on the indictment on December 16, 1997. According to the disclosures made by the state at oral argument, the original prosecutor assigned to this case departed the Attorney General's Office on December 17, 1997, a mere *five days* after the defendant arrived in Rhode Island and the day after his arraignment. There is no indication in the record when this resignation was announced and it appears that it may have occurred before defendant arrived in Rhode Island. The defendant did not receive the assistance of counsel until January 13, 1998, after thirty-two days had elapsed; certainly this is not the fault of defendant. There is no evidence in the record indicating when the next prosecutor was appointed, although this prosecutor was clearly on board before February 2, 1998, the fifty-second day, because he filed the state's first answer to defendant's request for discovery and inspection on that date. On February 26, 1998, the seventy-sixth day, the pretrial conference was inexplicably continued until March 3, 1998, the eighty-second day, at which point the case was not only passed for trial but was assigned a date certain for trial on May 18, 1998, the 158th day, well beyond the 120 day period permitted by § 13–13–2, Article IV(c). There is no transcript of the proceedings on that day and no indication why the hearing justice scheduled the trial to start thirty-eight days beyond the statutory maximum of 120 days. Further, the record discloses that as of March 1998, the state had not fulfilled its discovery obligation and still was updating its Super.R.Crim.P. 16 response.

Significantly, the state's motion for a continuance of the trial date was not filed until March 6, 1998, *after* the continuance to May 18 had been granted, and was not argued until March 13, 1998, the ninety-second day. Further, the reasons given by the prosecutor for the need for a continuance are questionable at best. The transcript provides as follows:

"[THE PROSECUTOR]: Mr. Clifton was brought back involuntarily from North Carolina. That is where he is serving a sentence currently. He is also currently charged with murder in the State of Rhode Island. His transfer date back to North Carolina is April 10th. At this point he was brought back involuntarily so the State only has four months[,] unless the Court grants an extension[,] in which to try him. I have moved for an extension of time. My motion indicates ninety days I'm requesting. If I could give the Court some background in the case. Mr. Livingston initially represented the State in this matter. And while Mr. Livingston was still in the office he was prepared to try the case and had asked that Mr. Clifton be brought back from North Carolina for that purpose. However, Mr. Livingston unexpectedly left the office. *An order had already been granted to bring Mr. Clifton back. When he was brought back I was assigned the case,* and for that reason I was not prepared to try it immediately. *It's taken me awhile to try to get up to speed in the case.* There has been discovery that's continually being furnished to the defense. Defense has not provided me with discovery.

"[THE COURT]: When will it be ready to be tried?

"[THE PROSECUTOR]: We already have a date certain for May 18th. And I expect—I also have an out-of-state wit-

ness. If I have the out-of-state witness subpoenaed for that date and *we can find our other witnesses* it will definitely go on May 18th." (Emphases added.)

Thus, three months after the defendant arrived in Rhode Island, discovery was outstanding; the state was not prepared for trial and had not located its witnesses. Defense counsel objected to the continuance and reminded the court that defendant was in this state involuntarily and that the state had 120 days to try this case. Defense counsel also argued that he recently had received discovery on two different occasions in the past week and, although he was having difficulty preparing the case as a result of the state's dilatory discovery compliance, defendant was prepared to proceed to trial and did not agree to any continuance. The court summarily granted the state's request for a ninety-day continuance, having made no findings or placed any reasons on the record. Trial commenced on the 172nd day.

On May 7, 1998, the 147th day, defendant's motion to dismiss was heard and summarily denied. In objecting to the motion to dismiss the prosecutor stated:

"[THE PROSECUTOR]: * * * When [defendant] was brought into the state the state had a hundred twenty days. That period ended on 4–28–98. On 3–13–98, however, you granted a ninety day extension in which the State had to try Mr. Clifton. That would have allowed us to July 28, 1998. We have a date certain in this case of May 18th, and the State expects it will go on that date. At this time[,] because there is a date certain on May 18th I haven't filed a formal written motion, but [defense counsel] indicated earlier there may be discovery that he will provide in this case. I would just ask it be provided, you know, as quickly as possible before the trial date.

"[DEFENSE COUNSEL]: To my knowledge at this date I don't have any discovery to provide. I will put that in writing.

"[THE COURT]: Motion to dismiss is denied."

In my opinion, there has been no showing of good cause and certainly no finding of good cause by the hearing justice relative to the need or the appropriateness of such a long continuance other than the convenience of the prosecutor. Indeed, at the hearing on the motion to dismiss, the prosecutor was mistaken about when the 120–day period expired; it was April 10, 1998, and not April 28, 1998. This suggests to me a rather casual approach to the state's obligations under the IADA. There was no real showing of why the state needed such a long continuance, other than it was "tak[ing the state] awhile to try to get up to speed."

"The purpose of the [IADA] is to encourage the speedy disposition of untried criminal accusations against persons already incarcerated in other [states]." *State v. Williams,* 917 S.W.2d 417, 418 (Tex.App.1996). It is a compact among the signatory jurisdictions, including the United States and the Commonwealth of Puerto Rico, and is designed to reduce the adverse effects of transfers upon the rehabilitation of prisoners who suffer the loss of beneficial programs when sent to other jurisdictions. *Id.* Thus, the receiving state, in this case Rhode Island, is obliged to begin the trial within 120 days or dismiss the charges against the out-of-state prisoner. By the agreement, the state does not enjoy the luxury of a continuance to "get up to speed." I know of no case in which failure to comply with the 120 day period has been excused because of the failure of the prosecution to be ready for trial. *See Dennett v. State,* 19 Md.App. 376, 311 A.2d 437, 442 (1973) (IADA re-

quires that the state be ready for trial within the time period, and its excuse for not trying the case must amount to more than lack of preparation). Nor am I convinced that the grant of a continuance beyond the statutory 120–day limit rests solely within the sound discretion of the hearing justice. The exercise of that discretion is controlled by the statute, particularly when the showing by the state was neither necessary nor reasonable, but rather was for the convenience of the prosecutor. The defense in this case did not ask for a continuance and indeed, indicated that notwithstanding the piecemeal compliance by the state of its discovery obligations, the defense was prepared to go to trial. *See Commonwealth v. Martin,* 445 Pa. 49, 282 A.2d 241, 244 (1971) (defense counsel request for a continuance constituted good cause to extend trial date beyond the statutory period). Further, I do not agree with the majority that this was a complex crime; the trial lasted five days and was comprised of eight witnesses. This was a straightforward murder with several eyewitnesses, one of whom was present in the car when the shots were fired, and a second, unbiased bystander who actually witnessed the murder and recognized the defendant from the neighborhood. The out-of-state witness that the state was so concerned about merely testi-fied to admissions made by defendant after he fled the state. Certainly this testimony was probative of defendant's guilt, but not critical, particularly when, as of the ninety-second day when it requested a continuance, the prosecutor was not sure the state had located its witnesses.

Finally, I note the mandate that the statute "shall be liberally construed so as to effectuate its purposes"—that is to effectuate the trial of cases involving out-of-state prisoners within 120 days of their arrival in Rhode Island absent a showing of good cause. Section 13–13–2, Article IX and Article IV(c); *see also Hoss v. Maryland,* 266 Md. 136, 292 A.2d 48 (1972) (lack of prejudice to the prisoner by noncompliance with the statutory deadline is irrelevant to the objectives of the IADA because the sanction was regarded as essential to produce compliance with the statutory mandate). There may have been good cause for the delay in bringing this case to trial, but, in my opinion, it is not shown on this record. Therefore, I respectfully dissent.