STATE

v.

**Norberto CABA.**

No. 2004–337–C.A.

Supreme Court of Rhode Island.

Dec. 21, 2005.

Diane B. Daigle, for Plaintiff.

Marie T. Roebuck, Providence, for Defendant.

Present: WILLIAMS, C.J.,
GOLDBERG, FLAHERTY, SUTTELL,
and ROBINSON, JJ.

## O P I N I O N

Justice SUTTELL, for the Court.

A jury found the defendant, Norberto Caba, guilty on one count of assault with a dangerous weapon. On November 7, 2003, the trial justice sentenced him to ten years at the Adult Correctional Institutions (ACI), with five years to serve, five years suspended, and five years probation, concurrent with a seventy-eight-month sentence he then was serving at the ACI as a probation violator. Mr. Caba timely appealed, arguing that the trial justice erred in denying the motion for judgment of acquittal that he made after the close of the state's case and later renewed at the close of evidence. This case came before the Supreme Court for oral argument, pursuant to an order directing the parties to show cause why the issues raised in this appeal should not be decided summarily. After considering the written and oral submissions of the parties and examining the record, we discern no such cause and shall proceed to decide this case without further briefing or argument. For the reasons set forth herein, we vacate the judgment of conviction.

### Facts and Procedural History

In July 2002, defendant brought his 1988 Mercedes Benz to mechanic Anel Perez at Sunset Motors, an automobile repair shop in Providence, for repairs to the vehicle's brakes, electronic dashboard displays, and air-conditioning ventilation system. At first, Mr. Perez informed defendant that the repairs would take about two days. Upon inspection, however, Mr. Perez realized that certain parts were broken and would have to be replaced. Accordingly, Mr. Perez had to either wait for the delivery of new, more expensive parts from a dealer, or take an entire day off from work and drive to a junkyard in Leominster, Massachusetts, that had the necessary used parts. At trial, Mr. Perez testified that defendant "wasn't happy" about the delay "because he wanted the car as soon as possible." To make matters worse, another Sunset Motors mechanic accidentally cracked the windshield on defendant's automobile, which Mr. Perez offered to replace free of charge.

According to Mr. Perez, Mr. Caba visited Sunset Motors "two or three days, couple times a day" to check on the status of the repairs. On July 17, 2002, Mr. Caba appeared at the repair shop approximately three times. Mr. Perez testified that defendant first arrived at around noon, and became "a little upset" when Mr. Perez explained that he needed two or three more days to finish the repairs. The defendant returned four hours later to inquire which parts Mr. Perez needed. Mr. Perez described the necessary parts and added that the automotive shop would replace the windshield last to prevent a similar accident from happening to a new windshield during repairs. The defendant became visibly "upset," demanding that Mr. Perez finish the repairs by the next morning or the mechanic would "be in big trouble."

Sometime after 6 p.m., defendant again returned to the automotive shop in a pickup truck. Mr. Perez approached the half-opened passenger window of the truck. According to Mr. Perez, defendant, from the driver's seat, asked whether the mechanic was going to fix the car "in his way or [defendant's] way." Mr. Perez testified that defendant was "very, very upset." Mr. Perez further testified that defendant then used his left hand to lift up his shirt, and with his right hand "pulled his gun" or "something like a gun" from his waistband.

As he did so, defendant said, "if my car not ready for tomorrow morning 8:00 o'clock, this will be for you." Mr. Perez raised his hands and slowly walked away from the vehicle. Thereafter, defendant placed the object alleged to be a gun back into his waistband, pulled down his shirt, and drove away. Mr. Perez immediately notified the police, who apprehended defendant shortly thereafter at his place of employment. A search of defendant's person and the pickup truck, however, did not produce a gun.

Mr. Caba was charged by criminal information with assault with a dangerous weapon (count 1), and assault with a device manufactured or designed to be substantially similar in appearance to a firearm (count 2). At trial, the only witness to testify for the prosecution was Anel Perez. At the close of the state's case, defendant moved that the court enter judgment of acquittal on the count of assault with a dangerous weapon pursuant to Rule 29(a) of the Superior Court Rules of Criminal Procedure. The defendant argued that the state had failed to prove either that the object was a gun or that the object, if indeed a gun, was operable. The trial justice denied defendant's motion, stating:

> "[T]here is more than sufficient evidence, if believed by the jury, to convict the defendant of this first charge. And, if they find that there is not with regard to the first charge, the Court is prepared to and will charge on the second offense which is use of a device designed to simulate a firearm. I certainly will not convict him of both because that is impossible and it has to be one or the other."

The defendant later renewed his motion for judgment of acquittal on count 1 at the close of all the evidence. Relying on the court's earlier reasoning, the trial justice also denied the renewed motion. After deliberation, the jury convicted defendant on count 1 of the information. In accordance with a jury instruction given by the trial justice, the jury did not address count 2 because it had returned a guilty verdict on count 1. Subsequently, the trial justice denied defendant's motion for a new trial. On November 7, 2003, Mr. Caba was sentenced to ten years, with five years to serve, to run concurrently with a sentence he was serving as a probation violator. Mr. Caba timely appealed, asserting that the trial justice erred in denying his motion for judgment of acquittal.

### Standard of Review

■ Whenever this Court reviews the denial of a motion for judgment of acquittal, we apply the same standard as that applied by the trial justice; namely, we "must view the evidence in the light most favorable to the state, * * * giving full credibility to the state's witnesses, and draw therefrom all reasonable inferences consistent with guilt." *State v. Higham,* 865 A.2d 1040, 1048 (R.I.2004) (quoting *State v. Otero,* 788 A.2d 469, 475 (R.I. 2002)). The trial justice is required to view "only that evidence that the prosecution claims is capable of supporting proof of guilt beyond a reasonable doubt." *State v. Andrades,* 725 A.2d 262, 263 (R.I.1999). If that examination does not reveal sufficient evidence to warrant a jury verdict of guilt beyond a reasonable doubt, the trial justice must grant the motion. *State v. Stierhoff,* 879 A.2d 425, 432 (R.I.2005).

### Discussion

■ The first count of the criminal information charged defendant with assault with a dangerous weapon in violation of G.L.1956 § 11–5–2. To succeed on such a charge, the state must prove three conjunctive elements: "[1] any unlawful offer to do corporal injury to another[,] [2] under such circumstances as may create a

reasonable apprehension of immediate injury unless the person so threatened takes action or inaction to avoid it, coupled with [3] a present ability to carry the offer into effect." *State v. Jeremiah*, 546 A.2d 183, 186–87 (R.I.1988). On appeal, defendant argues that the state failed to prove that the object in his waistband was a gun and, if it were a gun, that the gun was operable. As both such contentions relate to the third prong of the *Jeremiah* analysis, we narrow our discussion to a review of the sufficiency of the evidence from which the jury could have inferred "present ability."

In denying defendant's motion for judgment of acquittal at the close of the state's case, the trial justice predicated his ruling upon three cases: *State v. Jackson*, 752 A.2d 5 (R.I.2000); *State v. Andrade*, 657 A.2d 538 (R.I.1995); and *McLaughlin v. United States*, 476 U.S. 16, 106 S.Ct. 1677, 90 L.Ed.2d 15 (1986). In *Andrade*, 657 A.2d at 542, the defendant argued that the trial justice committed error by not granting his motion for judgment of acquittal of assault with a dangerous weapon and first-degree robbery "because there was no evidence the gun allegedly used was a dangerous weapon." A gun had neither been introduced into evidence, nor apparently ever recovered. *Id.* We held, however, that "[a]lthough the state did not introduce the weapon into evidence, the jury could nevertheless infer that defendant had wielded an operative pistol on the basis of his actions and statements." *Id.* at 543. The evidence in *Andrade* included the testimony of one Sharro Perron, who described being accosted in her apartment building by an armed intruder, whom she later identified as Andrade. Ms. Perron said

that the intruder "pointed a silver gun at her chest five to six inches away" and took her into the basement telling her not to scream and not to call the police after he left. She testified that the episode lasted about fifteen minutes. *Id.* at 539. Another witness, Craig Duffin, also testified against Andrade, and identified Andrade as the man who had pointed "a steel-gray firearm" at his face and had told him to lie down on the bed as he rifled through Duffin's bureaus and closets looking for drugs or cash. According to Mr. Duffin, the intruder said, "Today's your lucky day. I'm going to let you live." *Id.* at 540.

In *Jackson*, 752 A.2d at 9, we repeated with approbation the *Jeremiah* definition of the crime of assault with a dangerous weapon. The defendant in *Jackson* was convicted of the murder of a park ranger in Roger Williams Park, assault with intent to murder a Providence police officer, and assault with a dangerous weapon on a second Providence police officer. *Id.* at 7–8. On appeal, the defendant asserted that the trial justice erred in denying his motion for judgment of acquittal on this latter charge. *Id.* at 8. The evidence revealed that after firing five shots, one of which struck the park ranger and two the first police officer, the defendant "pointed his gun at [the second police officer's] head." *Id.* The defendant argued that, because all of the bullets in his weapon had been expended by the time he pointed it at the second police officer, he lacked the "actual present ability" to harm the said officer. *Id.*[1] In rejecting this claim, we held:

"[I]t is our opinion that an individual armed as defendant was with operable

---

1. In a search of the park after the shooting incident, police recovered the defendant's knapsack, which contained "a loaded sawed-off shotgun, a box filled with twenty live rounds of .38–caliber ammunition, and two live sixteen-gauge shotgun shells." *State v.*

*Jackson*, 752 A.2d 5, 8 (R.I.2000). Also seized from the defendant at the hospital was "a bag containing two sixteen-gauge shotgun shells, three twelve-gauge shotgun shells, and seventeen live .38–caliber rounds." *Id.*

guns and an arsenal of ammunition can be characterized as having the present ability to inflict injury with a dangerous weapon. [The second police officer] observed defendant fire several shots, some of which hit their presumed targets. [He] reasonably believed that defendant possessed a weapon which could inflict injury on him as well. But for the restraint of an armed officer, defendant could well have reloaded his weapon from the supply he carried. Under these circumstances, the trial justice was clearly correct in denying defendant's motion for judgment of acquittal." *Id.* at 9.

We again addressed the issue of "present ability" in *State v. Clifton*, 777 A.2d 1272 (R.I.2001). There, the defendant, a back-seat passenger in a Jeep, shot the driver several times in the back of the head. *Id.* at 1274. After the Jeep ran into a fence, the defendant jumped out and ran down the street, passing by a young boy. *Id.* at 1274–75. At trial the boy testified that, as the defendant approached him, the defendant slowed down and "put a gun in my face; pointed it towards me." *Id.* at 1275. In a statement to the police, the boy had described the gun as a "small black automatic pistol with a brown handle." *Id.* As in *Andrade*, the weapon never was recovered. *Id.* at 1278; *see Andrade*, 657 A.2d at 542. On appeal, the defendant asserted "that 'the state failed to produce a weapon or any other evidence' to prove that he had an operable, loaded firearm; therefore he suggest[ed], it could not prove the element of present ability to harm." *Clifton*, 777 A.2d at 1278. Applying the *Andrade* analysis, we again held that "one may infer the operability of a weapon from the overall context of the defendant's actions." *Id.* Accordingly, we concluded that sufficient evidence had been introduced from which a jury could properly infer that the defendant had the

"present ability" to carry out his threat. *Id.*

This Court has yet to apply the holding announced by the United States Supreme Court in *McLaughlin.* In *McLaughlin*, 476 U.S. at 17, the Supreme Court held that a gun, though unloaded, constituted a "dangerous weapon" within the meaning of a federal bank robbery statute. We prospectively adopted *McLaughlin's* reasoning to our "present ability" analysis in *Jackson*, stating in *dictum* that, "in future cases we shall apply the *McLaughlin* rule under which we shall presume that an unloaded *but operable* gun possesses a per se 'present ability to carry the offer [to do corporal injury to another] into effect.'" *Jackson*, 752 A.2d at 9–10 (quoting *Jeremiah*, 546 A.2d at 187). (Emphasis added.) We applied the *Andrade* analysis without the *McLaughlin* presumption in *Clifton*, however, because the defendant's 1998 trial occurred two years before our prospective *dictum* in *Jackson.* See *Clifton*, 777 A.2d at 1278. We did the same in *State v. Boillard*, 789 A.2d 881, 888 (R.I. 2002), a case that we discuss *infra*, because, as in *Clifton*, the defendant's trial took place before we issued our *Jackson* opinion.

 Unlike *Clifton* and *Boillard*, the facts in the case before us present an incident that occurred after our holding in *Jackson.* Thus, the "present ability" element of the crime of assault with a dangerous weapon may be satisfied by proof that defendant possessed an operable gun, whether loaded or not. See *Clifton*, 777 A.2d at 1278 n. 1. The state must nonetheless prove operability, which, per *Andrade* and its progeny, a fact-finder may infer from the actions and statements of the defendant. See *Andrade*, 657 A.2d at 543.

Upon review of the record, even viewing the evidence in the light most favorable to

the state, we are not satisfied that the state produced sufficient evidence from which a jury could infer beyond a reasonable doubt that defendant possessed an operable weapon. The only witness presented by the state was Anel Perez. He testified that on July 17, 2000, defendant visited his auto repair shop on three separate occasions to check on the status of his automobile, each time becoming increasingly agitated. Mr. Perez first mentioned a weapon in the following exchange:

"Q. When you explained to him you could do it his way or your way, what happened next?

"A. Then later after that he was on the driver side, right, and from the right-hand side waistband, he lift the shirt up and with left-hand side he pulled his shirt up and right pulled his gun.

"Q. A gun?

"A. Right, a gun.

"Q. Could you see a gun?

"A. I saw something like a gun, yes.

"Q. Did he pull it out of his waistband?

"A. Like it.

"Q. Then what happened?

"A. If my car not ready for tomorrow morning 8:00 o'clock, this will be for you."

Unfortunately, Mr. Perez was not asked on the record to describe the "gun" in any detail. Although the record states that he drew "a picture on the board," that picture was not preserved. As the ensuing colloquy between Mr. Perez and the prosecutor is significant to our analysis, we quote from the transcript in some detail:

"A. [Perez]: I saw something like this (indicating).

(PAUSE)

"A. That is what I saw. The line is—I didn't see the end.

"Q. [Prosecutor]: You didn't see the end?

"A. I didn't see the end.

"Q. So you saw this part of the gun?

"A. That part I saw and on the bottom, I saw like a silver clear then the black.

"Q. Could you come down one more time and show us what part was silver and what part was black?

"A. (Witness complies).

"Q. Sir, would it be fair to say this part right here, is that where the trigger goes?

"A. Well, looks like a trigger, yes.

"Q. When he pulled the gun out of his pants, where was his finger?

"A. He got the gun like this, so, I saw here and here a little bit. He like a silver color then because before he pulled the gun out I saw right here. Then after that he pull out, right. Because that is when I distinguish silver and black (indicating).

"Q. Did he have a finger on the trigger?

"A. I'm not sure. It was too fast.

"Q. Any doubt in your mind that was a gun?

"[Defendant's attorney]: Objection.

"THE COURT: Overruled. You may answer.

"A. Well, I saw that. That is what I saw.

"Q. Any doubt in your mind that you saw a gun?

"A. For that is gun, looks like a gun.

"Q. Could it be, I don't know, a pager, like a pager, cell phone? Could it have been that?

"[Defendant's attorney]: Objection.

"A. Can I explain to you something quickly because I don't have, have—

"THE COURT: Do you understand his question?

"THE WITNESS: Yes. He said can be a pager or cell phone.

"THE COURT: What is your answer to that?

"THE WITNESS: It would be no.

"A. No.

"Q. No?

"A. No.

"Q. And when he pulled the gun out and you saw the gun, what did he say?

"[Defendant's attorney]: Objection.

"THE COURT: Overruled.

"[Defendant's attorney]: Your Honor, if I—I don't believe that the testimony was that he pulled the gun out.

"THE COURT: All right as to the characterization, 'pulled the gun out,' rephrase your question.

"Q. Could you demonstrate again what Mr. Caba did when you looked in that window?

"A. First thing, he bring the shirt up but this, it hang. Second thing he pull out like this, and he told me if my car not ready for tomorrow in the morning, this will be for you. And, he put it back, pull the shirt down and he left.

"Q. Then you called the police?

"A. Yes.

"Q. Because he pulled the gun on you, didn't he?

"A. He pulled a gun, yes.

"[Prosecutor]: Thank you. I have nothing further."

The inquiry continued on cross-examination:

"Q. You don't [know] whether this is a gun or not? This could be a toy or any number of devices that I could name, correct?

"A. I don't know.

"Q. You don't know. It could be anything but what you say you saw was a

black handle with some silver, that is what you saw?

"A. That's correct, sir.

"Q. You saw an item or device of some sort with a black handle and silver on top? Would that be a fair statement?

"A. Yes, that I would say so.

"Q. We don't know whether this item was a firearm, do we? We don't know?

"A. I am not a specialist in firearms.

"Q. We don't know if this was an item even designed to look like a firearm, do we?

"[Prosecutor]: Objection.

"THE COURT: Well, he can answer the question. He drew the picture.

"A. I saw that. That is the only thing I can say. I saw that. · The only thing, I saw that (indicating).

" * * *

"Q. When this item, when Mr. Caba grabbed this item, did he say anything to you?

"A. He said if I—if by next day at 8:00 o'clock in the morning the car is not ready, that device will be for me.

"Q. What?

"A. That device, that device will be for me.

"Q. He said that device is for you?

"THE COURT: He used the word 'device.'

"THE WITNESS: Yes, he said this will be for you. Straight, he said this will be for you."

Later, on recross-examination, Mr. Perez was asked, "Do you know whether or not the thing fires?," to which he responded, "If it is gun, yes, it fires."

In contradistinction to the victims in *Andrade, Jackson,* and *Clifton,* Mr. Perez's identification of the object in defendant's waistband as a gun was equivocal at best. Mr. Perez apparently drew a picture of a

device that may have resembled a firearm, but described his drawing indistinctly. The only detail the witness could provide was that the device was silver and black on the bottom. When asked if one part of the picture was "where the trigger goes," Mr. Perez could only respond, "Well, looks like a trigger, yes." At one point, when asked if the device could have been a toy, Mr. Perez said, "I don't know." Based on this dubious testimony, we are unable to conclude that, even when viewed in the light most favorable to the state, there was sufficient evidence for the jury to infer that defendant brandished an operable firearm.

Our opinion in *Boillard* does not rehabilitate the vague testimony proffered by Mr. Perez in the case before us. In *Boillard,* we upheld the trial justice's denial of a motion for judgment of acquittal on a charge of assault with a dangerous weapon based on the testimony of a sixteen-year-old boy, Henry, who was only seven years old at the time of the assault. *Boillard,* 789 A.2d at 887–88. During trial, Henry testified that he was shown a weapon that "appeared to be a gun." *Id.* at 888. As the prosecutor pressed him further, Henry added, "It looked like a—not like a big rifle, you know, it looked like a handgun, something like that[,]" and then on cross-examination described the weapon as being "small" and "black." *Id.* The defendant had been charged with several counts of child molestation against Henry and his sister. *Id.* at 883. Although we held that, under the circumstances in *Boillard,* Henry's testimony was sufficient to support a jury inference of "present ability" to inflict harm, *id.* at 888, we do not believe that the facts in the case at bar warrant a similar conclusion.

Mr. Caba was convicted of felony assault, an offense providing a maximum of twenty years' imprisonment. Section 11–5–2. Upon our review of the record, we are simply not satisfied that the state produced sufficient evidence from which the jury could have inferred, beyond a reasonable doubt, the existence of an operable weapon necessary to establish a vital element in the crime of assault with a dangerous weapon.

## Conclusion

For the reasons set forth herein, we vacate the judgment of conviction and remand the record to the Superior Court.